**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No.: 0:23-cv-60795-JEM/Becerra

SUNSHINE STATE REGIONAL
CENTER, INC.,

       Plaintiff

v.

UR M. JADDOU, DIRECTOR,
UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES,

       Defendant.

_____/

<u>**REPORT AND RECOMMENDATION**[1]
**ON MOTION FOR PRELIMINARY INJUNCTION**</u>

      **THIS CAUSE** came before the Court on Plaintiff Sunshine State Regional Center Inc.'s

Motion for Preliminary Injunction and Notice of Expedited Motion.  ECF Nos. [5], [12].

Defendant Ur M. Jaddou, Director of the United States Citizenship and Immigration Services

("USCIS"), filed a Response and Plaintiff filed a Reply.  ECF Nos. [17], [18].  On May 23, 2023,

the Parties appeared before the Court for oral argument on the Motion (the "Hearing").  Upon due

consideration of the Motion, the pertinent portions of the record, the argument of counsel at the

Hearing, and the relevant legal authorities and being otherwise fully advised in the premises, it is

hereby **RECOMMENDED** that the Motion be **DENIED**.

---

[1] This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States
District Judge.  ECF No. [13].

## I.      BACKGROUND

The EB-5 visa program provides a pathway for immigrants to obtain lawful permanent resident status if they invest between $800,000 and $1,050,000 in a new commercial enterprise ("NCE") that will create at least ten full-time jobs within the United States.   8 U.S.C. § 1153(b)(5)(A).  In 1992, Congress expanded the EB-5 program by establishing the regional center "pilot program," which authorized "regional center[s] in the United States . . . for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, or increased domestic capital investment." *See* Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act 1993, Pub. L. No. 102-395, § 610(a), 106 Stat. 1828, 1874 (1992) (hereinafter the "Regional Center Program").  The Regional Center Program allowed visa applicants to invest in regional centers and allowed those centers to concentrate pooled investments in defined economic zones.  *Id.*; 8 C.F.R. § 204.6(e). "Under the Regional Center Program, the job-creation requirement may be satisfied by employees hired as an *indirect* result of the immigrant's investment in an NCE." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 98 (D.D.C. 2021) (citation omitted).  Congress has repeatedly reauthorized the Regional Center Program "on over thirty occasions since the program was first enacted in 1992." *Id.*  The Regional Center Program was most recently extended through June 30, 2021.  *Id.*  By that time, more than 600 regional centers operated throughout the United States.  Plaintiff is a designated regional center, first designated by USCIS in 2014.  ECF No. [5-2] ¶ 4.

On March 15, 2022, Congress enacted the EB-5 Integrity and Reform Act of 2022 (the "Act"), which reauthorized the Regional Center Program and instituted substantial reforms.  Pub. L. No. 117-103, 136 Stat. 49 (March 15, 2022); 8 U.S.C. § 1153(b)(5).  The instant case concerns a provision of the Act that requires the payment of monies by designated regional centers into the Integrity Fund.  Specifically, § 1153(b)(5)(J) states:

2

**(J) EB-5 Integrity Fund**

**(i) Establishment**

There is established in the United States Treasury a special fund, which shall be known as the "EB-5 Integrity Fund" (referred to in this subparagraph as the "Fund"). Amounts deposited into the Fund shall be available to the Secretary of Homeland Security until expended for the purposes set forth in clause (iii).

**(ii) Fees**

**(I) Annual fee**

On October 1, 2022, and each October 1 thereafter, the Secretary of Homeland Security shall collect for the Fund an annual fee--

**(aa)** except as provided in item (bb), of $20,000 from each *regional center designated under subparagraph (E)*; and

**(bb)** of $10,000 from each such regional center with 20 or fewer total investors in the preceding fiscal year in its new commercial enterprises.

\*\*\*

**(iv) Failure to pay fee**

The Secretary of Homeland Security shall--

**(I)** impose a reasonable penalty, which shall be deposited into the Fund, if any regional center does not pay the fee required under clause (ii) within 30 days after the date on which such fee is due; and

**(II)** terminate the designation of any regional center that does not pay the fee required under clause (ii) within 90 days after the date on which such fee is due.

8 U.S.C. § 1153(b)(5)(J) (emphasis added).  This annual fee (the "Integrity Fund Fee") is designed to further the goal of reducing fraud and abuse in the Regional Center Program.  Specifically, the Act states that the Integrity Fund Fee shall be used to conduct investigations outside the United States to monitor compliance with the Act, detect and investigate fraud or other crimes, ensure compliance with immigration laws, and conduct audits and site visits.  *Id*. at § 1153(b)(5)(J)(iii).

3

On March 2, 2023, nearly a year after the Act became effective, USCIS issued a Notice in the Federal Register announcing that it will begin collecting the Integrity Fund Fee from "designated regional centers" (the "Fee Notice"). 88 Fed. Reg. 13141-01 (DHS March 2, 2023). Specifically, the Fee Notice states in pertinent part that "[t]he 2022 Act requires the [Integrity] Fund to be financed through the collection of an annual fee paid by and collected from designated regional centers." *Id*. at 13142 (citing INA section, 203(b)(5)(J)(ii), 8 U.S.C. § 1153(b)(5)(J)(ii)). The Fee Notice further states that "USCIS will, as authorized by the 2022 Act, terminate the designation of any regional center that does not pay the full fee within 90 days after the date on which such fee is due . . . Termination will not be automatic and USCIS will provide a notice of intent to terminate and the opportunity for a regional center to prove the fee was paid in the proper amount by the due date before sending a notice of termination." *Id*. The 90-day deadline to pay the Integrity Fund Fee expires on May 31, 2023. *Id*. The Fee Notice requires Plaintiff, a Regional Center since 2014, to pay the Integrity Fund Fee.

## II.    THE INSTANT ACTION

On April 28, 2023, Plaintiff filed this action under the Administrative Procedures Act ("APA") to set aside the Fee Notice. ECF No. [1]. Plaintiff alleges that the Act distinguished between those Regional Centers created before the Act was passed, "Legacy-Regional Centers," and those after the Act was passed, "RIA-Regional Centers." *Id*. ¶ 28. Although neither of the terms "Legacy-Regional Centers" nor "RIA-Regional Centers" are found in the Act, Plaintiff argues that Congress exempted Legacy-Regional Centers from many of the Act's new requirements," including payment of the Integrity Fund Fee. As such, Plaintiff argues that the Fee Notice improperly "interpreted the [Integrity Fund] Fee statute to apply to all 'designated regional centers' … [and] does not exempt [L]egacy-Regional Centers from the [Integrity Fund] Fee." *Id*. ¶¶ 34, 38–39. Generally, Plaintiff alleges that the Fee Notice is arbitrary and capricious because

4

it (i) lacks any reasoning; (ii) fails to consider the statutory phrase "designated under subparagraph (E)" when interpreting § 1153(b)(5)(J)(ii); and (iii) "cannot be ascribed to a difference in view or the product of agency expertise to defy the plain language of the statute." *Id.* ¶ 59. Plaintiff further alleges that the Fee Notice is *ultra vires* "because the plain language of the statute limits the application of the [Integrity Fund] Fee to RIA Regional Centers 'designated under subparagraph (E)' of the RIA." *Id.*

On May 1, 2023, two months after USCIS published the Fee Notice, Plaintiff filed its Motion for Preliminary Injunction seeking to enjoin USCIS from collecting the Integrity Fund Fee from Plaintiff because it is a "Legacy-Regional Center". ECF No. [5]. Plaintiff argues that it has satisfied the four requirements to obtain a preliminary injunction, namely (i) a likelihood of success on the merits; (ii) irreparable harm if an injunction does not issue; (iii) a balancing of the equities, which weigh in favor of issuing an injunction; and (iv) issuance of an injunction would serve the public interest. In particular, Plaintiff argues it is likely to succeed on the merits of its APA claim because the Notice allegedly violates the plain language of subparagraph (J) by rendering the phrases "each regional center designated under subparagraph (E)" and "such regional center" superfluous. ECF No. [5] at 9–10. Plaintiff also argues that the Act "uses the phrase 'under subparagraph (E)' throughout to identify provisions that apply to new RIA Regional Centers, not [L]egacy-Regional Centers." *Id.* at 10–11. With respect to the remaining preliminary injunction requirements, Plaintiff argues that it will suffer irreparable harm because it will be terminated if it does not pay the Integrity Fund Fee by May 31, 2023, which will lead to the shutdown of Plaintiff and put pending investors at risk of denial or revocation. *Id.* at 11. Plaintiff also argues that the equities and public interest support an injunction. *Id.*

USCIS filed an Opposition to the Motion. ECF No. [17]. As a threshold matter, USCIS argues that the Court lacks subject-matter jurisdiction because the Fee Notice is not a final agency

action and the dispute is not yet ripe for resolution. *Id.* at 14–17. Specifically, USCIS characterizes the Fee Notice as a non-final interpretive rule from which no rights, obligations, or legal consequences flow, and argues that the action is not ripe because there is "no possible way of determining whether the alleged harm [to Plaintiff] will come to pass." *Id.* at 15–17.

USCIS then disputes each of the requirements necessary to obtain a preliminary injunction. USCIS argues that the plain language of the Act mandates that all Regional Centers be subject to the Integrity Fund Fee. *Id.* at 19. USCIS argues that the text of the Act as a whole supports its interpretation, as does subparagraph (E) in particular because it is "even backward looking regarding this issue – using the words 'has been designated' without limitation, contrary to [Plaintiff]'s argument that 'designated under subparagraph (E)' is limited only to post-enactment designations." *Id.* at 18. USCIS also argues that Plaintiff, as a designated Regional Center, is "designated under subparagraph (E)" because "there is no other provision of law that allows for such designations." *Id.* at 19. USCIS further argues that Plaintiff has not demonstrated irreparable harm because the injuries alleged depend upon speculative events, and "the *potential* monetary injury posed by the Integrity Fund Fee is insufficient" because "if the fee in this case were found unlawful and should never have been applied to [Plaintiff], Congress *has* provided that such potential damages may be pursued as an illegal exaction." *Id.* at 23–25. Finally, USCIS asserts that the balance of equities and public interest favor the Government.[2] *Id.* at 25–26.

In its Reply, Plaintiff argues that the Fee Notice constitutes final agency action because it "is the Agency's final word on *when* the [Integrity Fund] Fee is due for FY 2022 and *who* is required to pay it." ECF No. [18] at 2–3. Plaintiff also argues that the dispute is ripe because it is

---

[2] USCIS also argues that Plaintiff's request for a nationwide injunction is overbroad because Plaintiff does not have standing to seek relief for all other regional centers. ECF No. [17] at 26–27. In Reply, Plaintiff clarified that "it seeks only an injunction for itself." ECF No. [18] at 1 n.1.

clear from the mandatory language of the Fee Notice that termination *shall* result if Plaintiff fails to pay the Integrity Fund Fee by May 31, 2023.  *Id.*  Thus, Plaintiff argues, the guarantee of termination would present hardship if adjudication is withheld.  *Id.*  Plaintiff reiterated its argument that it is likely to succeed on the merits because "neither the text nor the structure of the [Act] requires a [L]egacy-Regional Center to get 're-designated' and therefore USCIS's conclusion that *all* regional centers are "designated under subparagraph (E) fails."  *Id*. at 6–7.  Moreover, Plaintiff again asserts that the shuttering of its business after termination constitutes irreparable harm.  *Id*. at 10.  Finally, Plaintiff asserts that the equities weigh in its favor because "the funds USCIS seeks to collect are earmarked for fraud investigation . . . [b]ut USCIS has no authority to investigate" because "Congress authorized USCIS only to adjudicate benefits petitions and in turn authorized ICE and CBP to investigate."  *Id*.

On May 11, 2023, Plaintiff filed a Notice to designate the Motion as expedited seeking a judicial determination before the deadline to pay the Integrity Fund Fee.  ECF No. [12].

## II.   ANALYSIS

Before proceeding to the legal analysis, it is important to step back and review where the Parties now stand from a procedural perspective and what issues are not in dispute.  Plaintiff has made clear that it will not pay the Integrity Fund Fee.  There is no allegation that Plaintiff cannot pay the Integrity Fund Fee—the argument is simply that Plaintiff objects to the agency's Fee Notice which makes it subject to the Act's Integrity Fund provision and therefore it will not pay the Integrity Fund Fee.  Should it fail to pay the Integrity Fund Fee by the upcoming deadline, USCIS will proceed (at some point thereafter) with terminating Plaintiff as a Regional Center.  It is unclear *when* that might happen, but clearly the agency will have the authority to do so.  In that termination process, Plaintiff would be afforded the right to show that it did pay, but it does not appear that it would have the opportunity to pay the fee at a later point in the administrative process

or if it did not prevail in its challenge to the fee.  If Plaintiff is terminated, its business would have to close although when that would happen is not certain.

Although the Parties spend considerable time addressing the harm that will result if USCIS moves to terminate, the legal issue before the Court is singular:  Does USCIS's Fee Notice interpreting the Act as requiring that all Regional Centers pay the Integrity Fund Fee comport with the Act?  And at the preliminary injunction stage, the issue is even more narrow: Can Plaintiff show that it is likely to succeed on that argument, and if so, will it suffer irreparable harm if the Court does not grant an injunction excusing it from paying the fee until the case at bar has concluded?  In short, the issue is not, nor could it be at this stage, whether Plaintiff's termination is proper.

For the reasons set forth below, the Court concludes that it does have subject matter jurisdiction to hear the Motion and proceeds to evaluate whether a preliminary injunction is warranted.  Because Plaintiff fails to demonstrate that it will likely succeed on the merits of its APA claim, and the irreparable harm that Plaintiff alleges would come from its own refusal to pay the Integrity Fund Fee—not from the Fee Notice—the undersigned **RECOMMENDS** that the Motion be **DENIED**.

### A.  The Court Has Subject Matter Jurisdiction.

Before proceeding to the merits, USCIS posits two arguments challenging the Court's subject matter jurisdiction herein.[3]  First, USCIS argues that the Fee Notice is not a final agency action and is thus not reviewable by this Court under the APA.  ECF No. [17] at 14–17.  Second,

---

[3] USCIS seeks both a denial of Plaintiff's Motion for Preliminary Injunction and dismissal of the action pursuant to Federal Rule of Civil Procedure 12(h)(3) for lack of subject matter jurisdiction. ECF No. [17] at 14.  Because USCIS has filed a separate motion to dismiss for lack of subject matter jurisdiction that has not been referred to the undersigned for consideration (ECF No. [20]) the Court will address only the former category of relief.

USCIS argues that the Parties' dispute is not yet ripe for adjudication. *Id.* at 16–17. At this juncture and on the briefing provided, the Court is not persuaded that it lacks jurisdiction to hear the Motion.

### 1. The Fee Notice Is A Final Agency Action.

USCIS argues that the Court lacks subject matter jurisdiction because there has been no final agency action as required for an APA claim. *Id.* at 8, 14–16. Specifically, USCIS argues that the Fee Notice is not a final agency action but rather, that the agency action that would be considered "final" would be the termination of Plaintiff's designation as a Regional Center—an agency action that USCIS contends has not happened. *Id.* at 16. In response, Plaintiff argues that the Court does have subject matter jurisdiction because the promulgation of the Fee Notice was a final agency action in that it was the "consummation of the Agency's decisionmaking process" and that it created the duty for Plaintiff to pay the Integrity Fund Fee. ECF No. [18] at 1–3.

 To bring suit under the APA, a plaintiff must show that the decision at issue was a "final agency action for which there is no other adequate remedy in a court." *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704); *see also Canal A Media Holding, LLC v. U.S. Citizenship and Immigration Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) ("[P]laintiffs must demonstrate that the decision at issue was 'final agency action.'"). Whether an agency's decision is a final agency action is a question of subject matter jurisdiction. *See Canal A Media Holding, LLC*, 964 F.3d at 1255. The Supreme Court has established a two-part test to determine whether an agency action is final. *Bennett*, 520 U.S. at 154. Under the Court's holding in *Bennett*, an agency action is final when: (1) the action "mark[s] the 'consummation' of the agency's decisionmaking process," rather than being "tentative or interlocutory in nature;" and (2) the action is "one by which 'rights or obligations have been determined,' or from which 'legal consequences

will flow.'" *Id.* at 177–78 (internal citations omitted); *see also LabMD, Inc. v. FTC*, 776 F.3d 1275, 1278 (11th Cir. 2015) (same).

As to the first prong of the *Bennett* test, Plaintiff argues that the Fee Notice is "the consummation of the Agency's decisionmaking process over whether the fee applies to [L]egacy-Regional Centers" because it is "the Agency's final word on . . . *who* is required to pay" the Integrity Fund Fee.  ECF No. [18] at 2.  Plaintiff adds that the Notice "indicates that it takes effect on March 2, 2023[,] and it does not seek comments," thus marking the "consummation of the decisionmaking process".  *Id.*  USCIS does not address this argument in its briefing.  *See* ECF No. [17].  At this juncture, the Court finds that the Fee Notice satisfies the first prong of the *Bennett* test.  The Fee Notice is published in the Federal Register in what appears to be its final form, and states that "DHS and USCIS are taking this action without prior notice and opportunity for comment because this document is a general statement of policy."  88 Fed. Reg. 13141-01, 13144 (DHS March 2, 2023).  Thus, the Fee Notice contains no indication that it is "tentative or interlocutory in nature."  *See Bennett*, 520 U.S. at 178.

The Parties dispute the second prong of the *Bennett* test, namely, whether the Fee Notice is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.*  USCIS argues that the Fee Notice "is clearly interpretive and does not create any new rights or obligations," because "it flows directly from § 1153(b)(5)(J)(ii)(I)'s command to USCIS."  ECF No. [17] at 8. [4]  By contrast, Plaintiff argues that the Fee Notice does

---

[4]  In support of its position, USCIS relies on two cases—both of which are distinguishable and notably non-binding.  First, in *Independent Equipment Dealers Association v. EPA*, the Circuit Court for the District of Columbia found that an EPA letter was not final where it "neither announced a new interpretation of the regulations nor effected a change in the regulations themselves."  372 F.3d 420, 427 (D.C. Cir. 2004).  The Court further explained that "[c]ompelling no one to do anything, the letter had no binding effect whatsoever—not on the agency and not on the regulated community."  *Id.*  The letter at issue, unlike the Fee Notice here, was not published in the Federal Register, and the parties did not contend that it imposed an expansion of an existing

"create[] a new duty for legacy-Regional Centers by 'interpreting' the statutory phrase 'each regional center designated under subparagraph (E)' to mean *all* regional centers, including" Plaintiff for the first time.  ECF No. [18] at 2.  On the record before it, the Court finds that the Fee Notice satisfies the second prong of the *Bennett* test because it clearly defines who has an obligation to pay the Integrity Fund Fee.

Given the arguments presented to the Court on this Motion, the Court finds that the Fee Notice should be read as a final agency decision; otherwise, Plaintiff might be effectively foreclosed from making *any* challenge to the agency's decision in *any* court.  Specifically, the Court takes issue with the USCIS's position that its decision to have all Regional Centers pay the Integrity Fund Fee would only be subject to attack under the APA *after* a Regional Center failed to pay and *after* that center received its notice of termination.  Under that theory, a Regional Center would have to fail to pay in order to challenge USCIS's decision to include it as a Regional Center covered by the Act under the APA because no other action would be "final" for purposes of subject matter jurisdiction.  If it failed to pay and later lost its challenge at the administrative level, there would be no opportunity for it to cure its failure to pay and the Regional Center would be forced to risk termination to challenge the agency's decision.  On the other hand, if a Regional Center paid, they would never be able to challenge the agency under the APA either because paying would obviate the need for a termination notice, which is the decision that the USCIS argues could be a

---

statute.  *Id.*  In the second case, *Association of Flight Attendants-CWA, AFL-CIO v. Huerta*, the Circuit Court for the District of Columbia found that an FAA notice was not final where it "create[d] no rights or obligations, and generate[d] no legal consequences," as "[n]o airline need[ed to] alter any policy in response to it."  785 F.3d 710, 714 (D.C. Cir. 2015).  Similarly, the notice at issue, unlike the Fee Notice here, was an internal guidance document not published in the Federal Register.  *Id.*  The Court found that the language used in the notice was "riddled with caveats," including the "use of language like 'may' and 'should' instead of 'shall' or 'must'," which suggested "that the provisions that follow are meant to be 'precatory, not mandatory.'"  *Id.* at 717–18.  By contrast, the Fee Notice uses mandatory language.  *See, e.g.,* 88 Fed. Reg. 13141-01, 13142 (DHS March 2, 2023) ("USCIS will begin collecting the fee . . . such fees are required").

final agency action.  In short, USCIS's position is that a Regional Center could only challenge the Fee Notice under the APA by not paying the fee and risking termination.

At the Hearing, in response to the Court's question as to what judicial review USCIS believed could be had of its decision to enforce the Integrity Fund Fee against Plaintiff, USCIS argued that the Court of Federal Claims would be the proper venue to challenge the Fee Notice. USCIS appears to take the position that its decision to include all Regional Centers in its Fee Notice is not subject to APA review *at all* unless a Regional Center is terminated.  The argument that the only challenge that could be lodged is one in the Court of Federal Claims is barely addressed by USCIS and was not addressed in the jurisdictional arguments at all.  Moreover, during the Hearing, Plaintiff's counsel argued in response that a suit in the Court of Federal Claims would not address their challenge because the Court of Federal Claims does not offer declaratory relief, nor could it set aside the Fee Notice.  USCIS's position that a party cannot lodge an APA challenge to an agency's interpretation of a statute's fee provision appears far too broad.  Given that subject matter jurisdiction can be raised at any time, *see In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1042 (11th Cir. 2008) ("Subject matter jurisdiction 'involves the court's power to hear a case' and therefore 'can never be forfeited or waived.'"), the Court declines to accept that argument as presented on this record at this time.

### 2.  The Dispute Is Ripe for Review.

USCIS also argues that the Court lacks subject matter jurisdiction because the Parties' dispute is not ripe for review.  ECF No. [17] at 16–17.  Specifically, USCIS argues that "the administrative process is still ongoing and in flux," such that it is not fit for judicial review, and "the fee itself will not by itself deleteriously impact the business of [Plaintiff]," such that there is no hardship in withholding judicial review.  *Id.*  Plaintiff responds that the dispute is fit for judicial review because the Fee Notice clearly announces that Plaintiff must pay the Integrity Fund Fee.

ECF No. [18] at 3. Plaintiff argues that there is also hardship in withholding judicial review—not through the payment of the Integrity Fund Fee—but through the virtual guarantee that Plaintiff would be subject to termination for non-payment of the Integrity Fund Fee. *Id.* at 4.

"The determination of ripeness 'goes to whether the district court ha[s] subject matter jurisdiction to hear the case.'" *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 591 (11th Cir. 1997) (citing *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.7 (11th Cir. 1989)). The "ripeness inquiry requires a two part 'determination of (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'" *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) (citing *Digital Props., Inc.*, 121 F.3d at 589 (quoting *Abbott Lab v. Gardner*, 387 U.S. 136, 148–49 (1967))); *see also Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967). First, "[i]n assessing the fitness prong, courts evaluate 'whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 46 (D.D.C. 2011) (quoting *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986)); *see also Toilet Goods Ass'n, Inc.*, 387 U.S. at 162–63. Thereafter, "[i]f a challenged decision is not 'fit' for review, 'the petitioner must show 'hardship' in order to overcome a claim of lack of ripeness.'" *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 46 (quoting *Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998)). However, "if a dispute otherwise qualifies as fit for review, any lack of hardship is irrelevant." *Rubenstein v. Fla. Bar*, 69 F. Supp. 3d 1331, 1344 (S.D. Fla. 2014).

As to fitness, USCIS argues only that the administrative process is still ongoing and is thus unfit for judicial review at this time. ECF No. [17] at 17. At the Hearing, USCIS clarified that the referenced "administrative process" is the process of challenging a NOIT—which the Court

reiterates is not the agency action at issue.  Plaintiff similarly focuses on the termination process and argues that while it has not yet been terminated, "USCIS has made it clear it *will* terminate regional center designations for those who do not pay the [Integrity Fund Fee] on or by May 31, 2023."  ECF No. [18] at 5.

The Court finds that the dispute is ripe for review.  First, as noted above, the Court already determined that the Fee Notice is a final agency action for purposes of this Report and Recommendation.  Second, Plaintiff's APA claim challenging the Fee Notice presents a purely legal issue because "[c]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues."  *Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003).  Finally, further administrative action is not needed to clarify the agency's already clear position.  The Fee Notice states, "[t]he 2022 Act requires the [Integrity] Fund to be financed through the collection of an annual fee paid by and collected from designated regional centers (Integrity Fund Fee)."  88 Fed. Reg. 13141-01, 13142 (DHS March 2, 2023).  While the Parties disagree as to whether USCIS properly made this determination, they agree that pursuant to the Fee Notice, Plaintiff is now required to pay the Integrity Fund Fee.  ECF Nos. [17] at 16; [18] at 3.  Having met all three criteria for fitness, the Court finds that hardship need not be analyzed and the dispute is ripe for judicial review.

### B.  Plaintiff Is Not Entitled To A Preliminary Injunction.

"A district court may grant [preliminary] injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. School Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citations omitted). "A preliminary

14

injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites." *Id.* (citations omitted).  The "[f]ailure to show any of the four factors is fatal[.]" *Id.* at 1178.  A "grant of preliminary injunction is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation omitted).

    **1.  Plaintiff Has Not Shown That It Is Likely To Succeed On The Merits Of Its APA Claim.**

Plaintiff argues that the Fee Notice, as applied to "Legacy-Regional Centers,"—that is, Regional Centers designated before the Act took effect—"is arbitrary and capricious, unlawful, and *ultra vires* because Congress did not intend to charge" Legacy-Regional Centers the Integrity Fund Fee.  ECF No. [5] at 8.  For the reasons outlined below, the Court finds that Plaintiff has not met its burden to show that it is likely to succeed on the merits of its claim.

    **a.  Standard Of Review**

We begin with clarifying the standard of review as the Parties' briefing applies and references multiple standards interchangeably, and somewhat inconsistently.  The Supreme Court instructs that "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  As such, "there is no plausible reason for deference" to the agency's interpretation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).  This is because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc.*, 467 U.S. at 843 n.9.

If, however, the court determines that the meaning of the statutory provision at issue is "genuinely ambiguous," then the possibility of deference arises. *Kisor*, 139 S. Ct. at 2414 ("the possibility of deference can arise only if a [provision] is genuinely ambiguous."). The Supreme Court recently reiterated that "[b]efore concluding that a [provision] is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction" and "cannot wave the ambiguity flag just because it found the [provision] impenetrable on first read." *Id*. at 2415. In short, when the Supreme Court uses the term "genuinely ambiguous" it "mean[s] it—genuinely ambiguous even after a court has resorted to all the standard tools of interpretation." *Id*. The tools in "that legal toolkit" require the court to "carefully consider the text, structure, history, and purpose" of the statute. *Id*.; *see also In re Gateway Radiology Consultants, P.A.*, 983 F. 3d 1239, 1256 (11th Cir. 2020) ("In applying the tools of construction, we focus on "the text of the statute, its structure, and its stated purpose.").

If the statute is ambiguous, the Court must then decide what deference should be given to the agency's decision. The arbitrary and capricious standard is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F. 3d 1353, 1360 (11th Cir. 2008) (citation omitted); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) ("We review the Secretary's exercise of discretion under the deferential arbitrary and capricious standard.") (citing 5 U. S. C. § 706(2)(A)) (quotation marks omitted). The Court's scope of review is "narrow", *Dep't of Commerce*, 139 S. Ct. at 2569, and its role is limited to "ensur[ing] that the agency came to a rational conclusion[.]" *Sierra Club*, 526 F. 3d at 1360 (citation omitted). The Court cannot "conduct its own investigation [or] substitute its own judgment for the administrative agency's decision." *Sierra Club*, 526 F. 3d at 1360 (citation omitted). A reviewing court's conclusion that agency action was arbitrary and capricious "requires [the court] to find no rational basis for the decision." *Tackitt v. Prudential Ins. Co. of America*, 758 F.2d 1572, 1575 (11th Cir. 1985) (citation omitted).

Under *Chevron*, a reviewing court determines whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id*. at 845. Rather, "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X*, 545 U.S. 967, 980 (2005).

It is true that "in some respects, *Chevron* review and arbitrary and capricious review overlap at the margins." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995). However, they serve distinct purposes. "[A] reviewing court's inquiry under *Chevron* is . . . focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Id*. Thus, "[t]he paradigmatic *Chevron* case concerns [t]he *power of an administrative agency* to administer a congressionally created ... program." *Id*. (quotation marks and citations omitted). By contrast, where the question is "whether the [agency's] discharge of [its] authority was reasonable[,] [s]uch a question falls within the province of traditional arbitrary and capricious review[.]" *Id*. (citation omitted).

Although Plaintiff's Motion makes various references to the *Chevron* standard, Plaintiff clarified at the Hearing that its position is that the statute is not ambiguous, and therefore, that the agency's interpretation is not to be afforded *any* deference. USCIS's position is also that the statute is unambiguous as it applies the Integrity Fund Fee to all Regional Centers. In the alternative, counsel noted at the Hearing that if deference needed to be given to the agency's interpretation of the Act, the proper standard would likely be *Skidmore* deference. Under *Skidmore* deference, an agency's statutory interpretation receives deference "corresponding to the 'thoroughness evident

in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Martin v. Soc. Sec. Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

Given the posture of the case, the Court does not need to reach the issue of what standard of deference, if any, should be afforded to the agency's decision. Plaintiff has not shown that it is likely to succeed on the argument that the statute unambiguously distinguishes between Regional Centers created before and after the Act for purposes of the Integrity Fund Fee.

> **b.    It Is Unlikely That Plaintiff Will Be Prevail In Its Argument That The Fee Notice Violates The APA.**

As mentioned, Plaintiff argues that the Act unambiguously reflects that "Legacy-Regional Centers" are not required to pay the Integrity Fund Fee. According to Plaintiff, USCIS's Fee Notice improperly interpreted 8 U.S.C. § 1153(b)(5)(J) to require that "designated" regional centers, as opposed to regional centers "designated under subparagraph (E)," pay the Integrity Fund Fee. There is no dispute that Plaintiff is a designated Regional Center, ECF No. [5-2] ¶ 4; the question is whether it is designated under subparagraph (E), as Plaintiff argues that only Regional Centers designated under (E) must pay the fee.

Plaintiff relies upon both the plain language and the structure of the Act to support its argument. Plaintiff argues that the plain language of the Act supports its position because Congress uses different terms, namely regional centers "designated under subparagraph (E)," "described in subparagraph (E)," or "designated regional centers," to distinguish between regional centers designated after enactment and all Regional Centers, including those that were already designated when the Act took effect. ECF Nos. [5] at 10; [18] at 6–8. Plaintiff also argues that

the plain language of the Act does not require it to get "re-designated" so "USCIS's conclusion that *all* regional centers are 'designated under subparagraph (E)' fails." ECF No. [18] at 6.

With respect to the structure of the Act, Plaintiff argues that it "contemplates the simultaneous existence of both [L]egacy-Regional Centers and post-March 15, 2022 Regional Centers." ECF No. [18] at 7. However, Plaintiff relies on the same statutory terms identified above to support its argument, thereby conflating the text of the Act with its structure. *Id*. Plaintiff also relies on a provision in the Act that requires USCIS to continue processing visa applications associated with a regional center that were filed before September 30, 2026, a year before the Act is set to expire. *Id*. at 8. According to Plaintiff, this reflects that the structure of the Act supports its position because "[t]he only way to read this provision holistically and rationally is that all immigrant visa petitions filed by September 30, 2026 are authorized by the 'regional center program under subparagraph (E),' not only those visa petitions associated with regional centers 'designated' under subparagraph (E)." *Id*. For the reasons noted below, Plaintiff's arguments are unpersuasive. Indeed, a careful consideration of the text, structure, history, and purpose of the statute supports the USCIS's reading of the Act.

### i. Plaintiff Has Not Shown A Likelihood That The Text Of The Act Supports Its Position.

First, we turn to the Integrity Fund Fee provision that states in pertinent part:

(I) **Annual fee**

On October 1, 2022, and each October 1 thereafter, the Secretary of Homeland Security shall collect for the Fund an annual fee--

(aa) except as provided in item (bb), of $20,000 from each *regional center designated under subparagraph (E)*; and

(bb) of $10,000 from each such regional center with 20 or fewer total investors in the preceding fiscal year in its new commercial enterprises.

8 U.S.C. § 1153 (b)(5)(J)(ii)(I) (emphasis supplied). The only reference to a "designated" regional

center in subparagraph (E) is in subpart (i) which states:

> **(E) Regional center program**
>
> **(i) In general**
>
> Visas under this subparagraph shall be made available through September 30, 2027, to qualified immigrants (and the eligible spouses and children of such immigrants) pooling their investments with 1 or more qualified immigrants participating in a program implementing this paragraph that involves a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth, including prospective job creation and increased domestic capital investment.

8 U.S.C. § 1153(b)(5)(E)(i). The "designation" language used in subparagraph (E)(i) is in the past

tense, referring to "a regional center in the United States, which *has been designated* by the

Secretary of Homeland Security . . . ." *Id.* (emphasis supplied). That language supports the

conclusion that Regional Centers already designated at the time the Act became effective are

considered "designated under subparagraph (E)."

Second, the basis of the designation described in subparagraph (E) largely tracks the

language used in the 1992 Appropriations Act that established the pilot program under which

Plaintiff was originally designated. In particular, subparagraph (E)(i) refers to a regional center

which has been designated by the Secretary of Homeland Security "on the basis of a proposal for

the promotion of economic growth, including prospective job creation and increased domestic

capital investment." 8 U.S.C. § 1153(b)(5)(E)(i). Similarly, the Appropriations Act stated that

"[S]uch pilot program shall involve a regional center in the United States *for the promotion of

economic growth, including . . . job creation, and increased domestic capital investment*." 106

Stat. 1874 (emphasis supplied). This overlap supports the reading advanced by USCIS—that

20

"regional centers designated under subparagraph (E)" include preexisting regional centers that were already designated by USCIS when the Act took effect.

Third, although Plaintiff asserts that "Congress set different rules for Legacy-Regional Centers – those designated before March 15, 2022," ECF No. [5] at 3, the Act does not use the term "Legacy-Regional Centers." In addition, the Act contains no other language that makes the distinction.

Instead, Plaintiff argues that "Congress repeatedly distinguished between Legacy-Regional Centers and RIA Regional Centers by identifying the latter as those 'designated under subparagraph (E).'" ECF No. [5] at 4. However, the provisions that Plaintiff cites to support this assertion merely refer to a Regional Center "designated under subparagraph (E)" or to the Regional Center program "described in subparagraph (E)."[5] They do not mention or otherwise distinguish Regional Centers that were previously designated. Plaintiff's conclusory assertion without meaningful analysis is insufficient.

Similarly, Plaintiff asserts that "the RIA distinguishes between regional centers 'designated under subparagraph (E)' and those 'described in subparagraph (E),'" and contends that "USCIS' interpretation renders this statutory disparities [sic] meaningless." ECF No. [18] at 7. Plaintiff points to the following provisions of the Act that purportedly refer to regional centers "described" in subparagraph (E): (i) § 1153(b)(5)(D)(iv) and (v); (ii) § 1153(b)(5)(G)(iii)(II)(bb) and (cc); (iii) § 1153(b)(5)(H)(v); (iv) § 1153(b)(5)(K)(ii); and (v) § 1153(b)(5)(S).[6] *Id.* However, these

---

[5] Plaintiff's citations to § 102(a)(2)(b)(iv) and § 103(b)(1)(G)(v), ECF No. [5] at 4, appear to be in error.

[6] Plaintiff refers to the corresponding Public Law citations, which are as follows: (i) § 102(a)(4)(D)(v) and (vi); (ii) § 103(b)(1)(G)(iii)(II)(bb) and (cc); (iii) § 103(b)(H)(v); (iv) § 103(b)(1)(K)(ii); and § 108. *See* P.L. 117-103, Div. BB, § 101 et seq., 136 Stat. 49, 1070 (Mar. 15, 2022).

provisions refer to the regional center *program*, not the regional centers themselves. *See, e.g.,* §
1153(b)(5)(D)(iv) ("The term infrastructure project means a capital investment project in a filed
or approved business plan, which is administered by a governmental entity (such as a Federal,
State, or local agency or authority) that is the job-creating entity contracting with a regional center
or new commercial enterprise to receive capital investment under the *regional center program*
described in subparagraph (E)") (emphasis supplied); § 1153(b)(5)(G)(iii)(II)(bb) ("The Director
shall establish a graduated set of sanctions based on the severity of the violations referred to in
subclause (I), including--temporary suspension from participation in *the program described* in
subparagraph (E)") (emphasis supplied); § 1153(b)(5)(K)(ii) ("If the Secretary determines that a
direct or third-party promoter has violated clause (i), the Secretary shall suspend or permanently
bar such individual from participation in *the program described* in subparagraph (E).") (emphasis
supplied).  Thus, there is no distinction between Regional Centers "designated" and "described"
in subparagraph (E), which the Fee Notice purportedly renders meaningless.

Plaintiff's reliance on *Behring Regional Center, LLC v. Mayorkas*, which Plaintiff
contends supports the conclusion that "[t]he RIA, therefore, does not require [L]egacy-Regional
Centers to get 'designated under subparagraph (E),'" ECF No. [5] at 3, is misplaced.  Indeed,
*Behring* contradicts Plaintiff's argument.  In *Behring*, the court considered USCIS's refusal to
process new petitions submitted by immigrants investing through regional centers that were
previously designated under the 1992 Appropriations Act.  No. 22-cv-02487, 2022 WL 2290594,
at *1–2 (N.D. Cal. June 24, 2022).  USCIS refused to do so because it interpreted the Act as
deauthorizing existing regional centers. *Id*. at *2.  The *Behring* court found the plaintiff was likely
to succeed on its claim that USCIS wrongly interpreted the Act because the "Act does not clearly
answer the question whether Congress meant to strip existing regional centers of their
authorization." *Id*. at *6.  That existing designated regional centers remained authorized does not

negate the conclusion that such centers are considered "designated under subparagraph (E)."  Nor does it support the conclusion that designated regional centers existing at the time the Act became effective are excused from compliance with the Act as a whole or the Integrity Fund Fee provision in particular.  Indeed, the *Behring* court repeatedly recognized that "the agency may do whatever is reasonably necessary to ensure that *existing regional centers comply with the Integrity Act*" and such centers "must presently be permitted to operate *within the regime created by the Act*."  *Id.* at *7; *see also id.* at *3 ("Of course, this is not to say that the agency is precluded from taking action to ensure that existing regional centers comply with the new requirements of the Integrity Act[.]").

Notably, Plaintiff takes the position that subparagraph (E) "reauthorized [L]egacy-Regional Centers."  ECF No. [18] at 7.  However, if previously designated centers derive their authorization from subparagraph (E) as Plaintiff admits, it follows that such centers are also considered "designated under subparagraph (E)" for purposes of the Act.  Plaintiff offers no basis to conclude that Congress intended to consider "Legacy-Regional Centers" as reauthorized but not designated under subparagraph (E).  Indeed, given that the 1992 Appropriations Act under which Plaintiff originally obtained its designation has lapsed, there is no other statutory authority besides the Integrity Act under which Plaintiff can still be considered a designated Regional Center.

Simply stated, the sections of the Act upon which Plaintiff relies do not reflect that the Act treats Regional Centers differently depending upon whether they were designated before or after the Act became effective, either for purposes of subparagraph (E) or the Integrity Fund Fee in subparagraph (J).  To the contrary, the language of subparagraph (E) reflects that previously designated Regional Centers are considered "designated under subparagraph (E)" and, thus, must pay the Integrity Fund Fee.

### ii.   Plaintiff Has Not Shown A Likelihood That The Structure Of The Act Supports Its Position.

Plaintiff relies on § 1153(b)(5)(H)(i)[7] to support its assertion that Congress distinguished between "[L]egacy-Regional Centers and [new] RIA Regional Centers" because "if a [L]egacy-Regional Center does not want to seek any new investors, the RIA requires them to do nothing and protects any still-pending EB-5 applications associated with the dormant legacy-Regional Center." ECF No. [5] at 4.   However, Section 1153(b)(5)(H)(i) does not concern processing EB-5 applications associated with regional centers that were designated before the Act became effective; it concerns the ability of USCIS to exclude certain persons from being involved with a regional center because of the individual's prior misconduct.

Plaintiff's argument is also flawed because it conflates the processing of immigrants' EB-5 applications on the one hand with the designation of a Regional Center under subparagraph (E) and payment of the Integrity Fund Fee on the other.   This flaw is also present in Plaintiff's argument that § 1153(b)(5)(S)[8] "clearly illustrates Congress's intent to recognize both legacy-Regional Centers and RIA Regional Centers."  ECF No. [18] at 8.  Section 1153(b)(5)(S) states in pertinent part:

> **(S)  Protection from expired legislation**
>
> Notwithstanding the expiration of legislation authorizing the regional center program under subparagraph (E), the Secretary of Homeland Security--
>
> **(i)** shall continue processing petitions under sections 1154(a)(1)(H) and 1186b of this title based on an investment in a new commercial enterprise associated with a regional center that were filed on or before September 30, 2026;

---

[7] This is section 103(b)(1)(H)(i) of the Public Law, which is the citation that Plaintiff uses in its Motion.

[8] This is section 108 of the Public Law, which is the citation to which Plaintiff refers in its Reply.

8 U.S.C. § 1153(b)(5)(S)(i).  The fact that USCIS will process EB-5 applications submitted prior to September 2026 does not demonstrate that Congress intended to exclude previously designated regional centers from compliance with the Act.  In other words, a decision to protect investors (i.e., immigrants submitting EB-5 visa applications) in a previously designated regional center is not equivalent to protecting the previously designated regional centers themselves from complying with the requirements of the Act.

Finally, other provisions of the Act reflect that when Congress wanted to allow a Regional Center to rely on pre-enactment conduct, it explicitly said so.  For example, subparagraph (F) addresses approval of business plans for regional center investments.  8 U.S.C. § 1153(b)(5)(F). It sets forth the requirement that "[a] regional center shall file an application with the Secretary of Homeland Security for each particular investment offering through an associated new commercial enterprise before any alien files a petition for classification under this paragraph by reason of investment in that offering."  *Id*. at § 1153(b)(5)(F)(i).  Subparagraph (F) specifies that "[t]he approval of an application under this subparagraph, *including an approval before March 15, 2022*, shall be binding for purposes of the adjudication of subsequent petitions seeking classification under this paragraph by immigrants investing in the same offering described in such application[.]" *Id*. at § 1153(b)(5)(F)(ii) (emphasis supplied).  Thus, if Congress intended for regional centers designated before March 15, 2022, to be excused from paying the Integrity Fund Fee, it could have included language that limited applicability of subparagraph (J) "to regional centers designated under subparagraph (E) *after March 15, 2022*."  It did not do so.

### iii.   Plaintiff Has Not Shown A Likelihood That The Purpose and Legislative History Of The Act Support Its Position.

Not only does the plain language and structure of the Act reflect that Congress intended that previously designated regional centers pay the Integrity Fund Fee, so too does the purpose and

legislative history of the Act.  Congress passed the Integrity Act to help curb fraud and abuse in the EB-5 visa program. As reflected in the legislative history, Senator Charles Grassley, one of the primary authors of the Act, stated that the legislation "codifies a number of our long-sought reforms designed to enhance the integrity of the regional center program and prevent fraud and abuse that have plagued it for far too long."  168 Cong. Rec. S1105 (daily ed. Mar. 10, 2022).

Subparagraph (E) includes important requirements that further this purpose, such as requiring regional centers to create and preserve certain records and submit to audits by USCIS. *See* 8 U.S.C. § 1153(b)(5)(E)(vii)(I), (II).  At the Hearing, Plaintiff's counsel acknowledged that Plaintiff must comply with these requirements.  This admission reveals an important flaw in Plaintiff's position.  Plaintiff fails to explain how it can be bound by certain provisions in subparagraph (E), yet not be considered designated under that subparagraph, especially since (as discussed above) there is no other statutory basis from which it can derive its designation.  Taken to its logical conclusion, Plaintiff's construction of subparagraph (J) to exclude previously designated regional centers would mean that those centers do not fall within subparagraph (E) and, thus, would not have to adhere to the safeguards included therein.  Plaintiff offers no basis for the Court to conclude that Congress intended to allow the more than 600 previously designated regional centers to avoid these requirements, much less the payment of the Integrity Fund Fee. Indeed, Plaintiff's interpretation would frustrate, rather than further, Congress's goals in enacting the Act.

In sum, for the foregoing reasons, the undersigned concludes that it is unlikely Plaintiff will be able to show that the Act unambiguously exempts previously designated regional centers from payment of the Integrity Fund Fee.  To the contrary, it appears that the Act unambiguously includes previously designated regional centers in "regional centers designated under subparagraph (E)," such that all regional centers must pay the Integrity Fund Fee pursuant to

subparagraph (J).  Accordingly, Plaintiff has not demonstrated that it is likely to succeed on the merits of its APA claim.

### 2. Plaintiff Has Not Shown It Will Suffer Irreparable Harm Absent A Preliminary Injunction.

A "showing of irreparable injury is the *sine qua non* of injunctive relief."  *Siegel*, 234 F.3d at 1176 (quotation marks and citation omitted).  "[E]ven if plaintiff[ ] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Id.* (citations omitted).  Further, "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent."  *Id*. at 1176–77 (quotation marks and citation omitted).

Plaintiff argues that it will suffer irreparable harm if it does not pay the Integrity Fund Fee because USCIS will terminate Plaintiff's designation, which will "close Sunshine State and cost American jobs; put at risk dozens of pending EB-5 petitions; and lead to significant litigation between the investors, the regional centers, and [USCIS]."  ECF No. [5] at 11.  This argument is fundamentally flawed for at least one important reason: the alleged harm is self-inflicted.

Indeed, Plaintiff is *choosing* not to pay the Integrity Fund Fee, as it readily acknowledges that "Sunshine State has not paid the RIA Annual Fees, and it does not intend to pay them because the RIA does not require it to pay them."  ECF No. [5-2] ¶ 7.  The alleged harm that Plaintiff asserts will occur does not result from the Fee Notice, but rather, from Plaintiff's decision not to pay the Integrity Fund Fee before the deadline.  Indeed, as the United States District Court for the District of Columbia recently found when denying an identical request for a preliminary injunction, "this existential harm will only come to pass if Plaintiffs refuse to pay the Integrity Fund Fee."  ECF No. [26-1] at 5 (citing Order Denying Plaintiffs' Motion for Preliminary Injunction, *EB5 Holdings, Inc. v. Jaddou*, No. 23-cv-1180 (D.D.C. May 24, 2023)).

"[I]t is well settled that avoidable harm is not irreparable; if a Plaintiff can mitigate the threatened irreparable harm, [it] cannot refuse to do so and yet still claim that [it] would be irreparably injured absent an injunction." *Bellin v. La Pensee Condo. Assoc. Inc.*, No. 05-80071, 2005 WL 8156021, at *9 (S.D. Fla. Oct. 13, 2005), *report and recommendation adopted*, No. 05-80071, 2006 WL 8433644, at *1–2 (S.D. Fla. Jan. 6, 2006); *see also Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) ("[A] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted."); *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable[.]"); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 (3d ed. 2023) ("a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."); *Scroos LLC v. Attorney Gen. of United States*, No. 6:20-cv-689, 2020 WL 5534281, at *3 (M.D. Fla. Aug. 27, 2020) ("Self-inflicted wounds do not constitute irreparable harm.") (citations omitted); *Wall v. Ctrs. for Disease Control & Prevention*, 588 F. Supp. 3d 1301, 1304 (M.D. Fla. 2022) ("And the outright refusal to wear a mask, without possessing a valid exemption from the FTMM, is a voluntary choice, not irreparable harm.") (citations omitted).  This includes "plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2001).

The *Bellin* decision from this District is instructive.  The plaintiff in *Bellin* sought a preliminary injunction to prohibit her condominium association from levying special assessments against her in the future.  *Bellin*, 2005 WL 8156021, at *2.  The court rejected the plaintiff's assertion "that she will be irreparably harmed if [the association] is permitted to foreclose on her condominium and she is ousted therefrom [because] Plaintiff can take a simple step to avoid such an outcome: she can pay the assessments levied by [the association]." *Id*. at *9.  The *Bellin* court

reasoned that "it is unknown whether [the association] will levy any future special assessments . . . and, even if [the association] were to do so, Plaintiff would not suffer irreparable harm as a result; indeed, no harm whatsoever would result from any such levies themselves. Rather, Plaintiff would suffer irreparable harm if - and only if - she were not to pay such levies and [the association] were to obtain a lien and commence foreclosure proceedings against her as a result and [the association] w[as] successful in foreclosing that lien." *Id*.

Here, Plaintiff is refusing to pay the Integrity Fund Fee, because it believes it should not have to, and seeks resolution of the Motion on an expedited basis so that it can have the comfort of knowing whether its position is correct before the payment deadline expires. That does not rise to the level of irreparable harm. Plaintiff can avoid the harm alleged by paying the Integrity Fund Fee and continuing to litigate the matter before this Court, or if USCIS prevails on the jurisdictional argument at a later date, in the Court of Federal Claims. *See Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020) (describing an "illegal exaction" claim as one in which "the plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation") (quotation marks and citation omitted); *cf. Papaliolios v. Durning*, 167 F.2d 737 (2d Cir. 1948) (affirming order denying preliminary injunction in declaratory judgment action concerning fine imposed on steamship because "the plaintiff can obtain clearance by paying the fine under protest and can then recover it by suit, if the fine was illegally imposed").

In short, Plaintiff's challenge can be heard, it simply cannot bar USCIS from collecting on the Integrity Fund Fee while the matter is pending. This is so not only because Plaintiff cannot show that its reading of the Act is likely to prevail, but because the harm alleged (putting aside whether it is speculative) is not as a result of the agency's Fee Notice—it is as a result of Plaintiff's refusal to pay. Of course, Plaintiff can refuse to pay, but if it ultimately loses it risks termination.

If Plaintiff pays and ultimately wins, it might have to seek reimbursement of its payment by way

of an action in the Court of Federal Claims.  Plaintiff complains that it should not have to bring a

second action for its reimbursement, and that it should be entitled to an injunction to avoid doing

so.  However, seeking a preliminary injunction to avoid a second lawsuit is hardly irreparable

harm.

 For the reasons noted above, the undersigned concludes that Plaintiff has failed to show it

will suffer irreparable harm absent a preliminary injunction.[9]

### III. CONCLUSION

 Based on the foregoing, it is hereby **RECOMMENDED** that Plaintiff's Motion for

Preliminary Injunction, ECF No. [5], be **DENIED**.

### IV. OBJECTIONS

 A party shall serve and file written objections, if any, to this Report and Recommendation

with the District Court by **10:00 a.m. on May 27, 2023**.  The undersigned has shortened the

objection period given the Integrity Fund Fee payment deadline of May 31, 2023 and Plaintiff's

---

[9] USCIS argues that Plaintiff's termination, the irreparable harm alleged, is an administrative process that "is still ongoing and in flux." ECF No. [17] at 17.  As such, USCIS contends that the alleged injury is speculative and insufficient for purposes of the irreparable harm analysis.  As the *Bellin* court recognized, "[a]t this stage of the proceedings, it is unclear whether [the association] would [levy special assessments] (although its conduct to date suggests that it might) . . . The possibility that this potential for irreparable harm looms in the indefinite future is insufficient to support a preliminary injunction." *Bellin*, 2005 WL 8156021, at *9.  Thus, Plaintiff has failed to show that it will suffer irreparable injury absent a preliminary injunction. *See, e.g., Siegel*, 234 F.3d at 1176–77 ("[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent.").

However, as noted above, the Court does not rely on the argument that Plaintiff must wait to bring the action until the termination process begins because doing so would not provide Plaintiff the opportunity to challenge the agency's action without risking the final termination of its business.  To argue that the damage is speculative under these facts and given USCIS's position on the jurisdictional analysis would leave Plaintiff without any recourse.  Nonetheless, the termination and the potential loss of its business can readily be avoided by Plaintiff, and as such, no preliminary injunction should issue.

request to treat its Motion as expedited. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on May 25, 2023.

_____
**JACQUELINE BECERRA**
**United States Magistrate Judge**